IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | H-3-436 |
| | § | Judge Atlas |
| Olabode Timothy Aransiola | § | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR A REDUCTION OF SENTENCE PURSUANT TO <u>18 U.S.C.§ 3582(c)(1)(A)(i) AND PERTAINING TO COVID-19</u>**

Olabode Timothy Aransiola has filed a motion asking this Court to grant him compassionate release and reduce or modify his sentence based on concerns regarding the COVID-19 pandemic. The United States respectfully opposes the motion. Aransiola has not met his burden of establishing that a sentence reduction is warranted under the statute.

### Defendant's Conviction and Current Motion

On April 6 2004, Aransiola was charged in a multi-count superseding indictment with ten other co-defendants with drug offenses: 1) conspiracy to import more than one kilogram or more of heroin, in violation of 21 §§ 952(a), 960(a), (b)(1)(A) and 96; (2) conspiracy to possess with the intent to distribute more than one kilogram of heroin, in violation of 21 §§ 841(a)(1), (b)(1)(A) and 846. Aransiola was found guilty by a jury and was sentenced by this Court on January 31, 2005, to 360 months. Aransiola was held accountable for approximately 25 kilograms of heroin. On October 13, 2020, Aransiola filed a motion for compassionate release pursuant to 18 U.S.C. 3582(c)(1)(A).

### BOP's Response to the COVID-19 Pandemic

Olabode Timothy Aransiola is currently being incarcerated at Giles W. Danby Federal Correctional Institution https://www.bop.gov/inmateloc/ (Danby CI). As of February 26, 2021, Danby CI is housing 1,475 inmates. Of those 1,475 inmates, 4 are currently positive for Covid-19. Since February, 2020, there have been 3 inmate deaths and 91 inmates have since recovered from Covid-19 https://www.bop.gov/coronavirus. In addition, The Bureau of Prisons (BOP) is currently coordinating and initiating the issuance of vaccines to staff and inmates. BOP received its first vaccine supplies in mid-December, and additional supplies continue to be received as BOP expands its vaccination program across its institutions. As of February 26, 2021, 59,007 doses of

the Vaccine have been administered throughout the institutions and 70 locations have received second doses https://www.bop.gov/resources/news/20210223_vaccination_status.jsp. Both Pfizer and Moderna vaccines are currently being received.

BOP recognizes that COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and has resulted in massive disruption to our society and economy. BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: (October 8, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp

In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January, 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan, to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 13, 2020, BOP implemented Phase Six of the Action Plan, which currently governs operations. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step will limit transmissions of the disease. Likewise, all official staff travel

has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly-admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended until further notice, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. BOP is sharing the Action Plan with facilities providing halfway-house confinement.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising

greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).

On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* https://dojnet.doj.gov/usao/eousa/ole/tables/misc/agcovid2.pdf. As of this filing, BOP has transferred an additional 7,569 inmates to home confinement. Since March 26, 2020 to present, BOP has transferred 22, 158 inmates to home confinement. *See* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately, some inmates have become ill, and BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources

to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider a myriad of other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## Legal Framework for Compassionate Release

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. 18 U.S.C. § 3582(c)(1)(A). A court may grant a defendant's motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under Section 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the Section 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in

18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.[1]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

## Argument

This Court should deny Aransiola's request for compassionate because he has not established "extraordinary and compelling reasons" for release.

Aransiola's motion should be denied because he has not identified "extraordinary and compelling reasons" for a reduction within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement.

In this case, Aransiola claims he should be released from custody because he has Hepatitas B (Doc. 654 p. 16).

The US Department of Justice's Bureau of Justice Statistics periodically generates a prison and jail census and other reports on incarcerated populations, which include limited health-related information. Data from the 2011–2012 National Prisoner Survey[2] indicate that

---

[1] U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. U.S.S.G. § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." U.S.S.G. § 1B1.13, cmt. n.1(D).

[2] Bureau of Justice Statistics, US Department of Justice National inmate survey, 2011–2012. Ann Arbor, MI: Bureau of Justice Statistics; 2015.

50% of all US federal incarcerated individuals report having 1 or more chronic medical conditions, including cancer, hypertension, or history of stroke, diabetes, heart disease, kidney disease, arthritis, asthma, or cirrhosis. According to the Bureau of Justice Statistics' "Medical Problems of Prisoners," a 2004 survey of prisoners in state and federal correctional facilities providing self-reported prevalence rates of medical problems[3], 64.3% of state and federal incarcerated individuals age 45 years or older reported having a current medical problem. The most prevalent reported medical problems were arthritis (30.5%), hypertension (29.5%), heart problems (13.1%), tuberculosis (13.0%), diabetes (12.1%), and hepatitis (9.8%). According to the same report, 37.5% of incarcerated individuals reported having a chronic impairment or condition, including the following: vision (17.4%), learning (13.3%), hearing (11.4%), mobility (6.1%), mental (5.0%), and/or speech (3.5%). Granting requests similar to Aransiola would result in the mass release of inmates.

As stated above, under the relevant provision of Section 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

Any reduction under this provision must comply with the applicable policy statement articulated by the United States Sentencing Commission. See U.S. Sentencing Guidelines ("U.S.S.G.") § lBl.13 (U.S. Sentencing Comm'n 2018) (reflecting the applicable policy statement on reductions to a term of imprisonment under 18 U.S.C. § 3582 (c) (1) (A)). If extraordinary and compelling reasons are found to exist, the policy statement found in U.S.S.G.§ lBl.13(2) authorizes early release if the court finds that the defendant "is not a danger to the safety of any other person or the community, as provided in 18 U.S.C. § 3142(g)." Decisions about whether to grant or deny a request for release under § 3582(c)(1)(A) are discretionary, depending on the court's consideration of the applicable

---

[3] Bureau of Justice Statistics, US Department of Justice Medical problems of prisoners. Washington, DC: Bureau of Justice Statistics; August 29, 2017.

policy statement and other factors found in 18 U.S.C. § 3553(a). See *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020).

The applicable policy statement from the Sentencing Commission, found in comments to U.S.S.G. § lBl.13, reflects that early release is available for defendants as the result of a motion by the Director of the Bureau of Prisons ("BOP") under 18 U.S.C. § 3582 (c) (1) (A), provided that they meet one of the following criteria:

(A) The defendant is suffering from "terminal illness or a serious physical or mental health condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances such as the "death or incapacitation of the caregiver for the defendant's child or where the defendant would be the only caregiver for an incapacitated spouse or registered partner. U. S. S. G. § 1B1.13, cmt. n . 1 (A)- (C). There is also a fourth provision that gives the BOP Director the authority to determine if a sentence reduction is appropriate because "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other categories. Id. cmt. n.l (D).

The policy statement found at U.S.S.G. § lBl.13 has not been updated since the First Step Act was enacted in late 2018.[4] Because prisoners can now petition the court directly for a reduction in sentence under the First Step Act, without waiting for a motion filed on their behalf by the BOP, courts have concluded that the policy statement may continue to serve as "helpful guidance," but does not "constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)." *United States v. Rodriguez*, - F. Supp. 3d -, 2020 WL 1627331, at *4 (E.D.

---

[4] See *United States v. Cantu-Rivera*, Cr. No. H-89-204, 2019 WL 2578272, at *2, n.l (S.D. Tex. 2019) (observing that "the current policy statement predates the enactment of the First Step Act and is not likely to be amended within the foreseeable future due to lack of a sufficient number of serving members of the Sentencing Commission").

Pa. April 1, 2020) (collecting cases); see also *United States v. Cantu*, 423 F. Supp. 3d 345, 352 (S.D. Tex. 2019) ("[W]hen a defendant brings a motion for a sentence reduction under the amended provision [found at § 3852(c)(1)(A)], the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § lBl.13 cmt. n.l (A)-(C) warrant granting relief.").

Aransiola's COVID-related concerns do not constitute extraordinary and compelling reasons under the compassionate-release statute. Section 3582(c)(1)(A) provides that any reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

Neither the policy statement nor the BOP regulation address any basis for compassionate release based on general COVID-19 concerns, nor would they be expected to, because of COVID-19's novelty. Rather, the grounds for compassionate release the Commission identified are all based on inherently individual circumstances—health, age, and family responsibilities—and, not surprisingly, nothing remotely comparable to the general COVID-19 concerns that thousands of offenders could cite in compassionate-release motions.

The Sentencing Commission's existing policy statement should serve as helpful guidance on the factors that support compassionate release." *United States v. Fox*, 2019 WL 3046086, *3 (D. Me. July 11, 2019); accord *United States v. Weidenhamer*, 2019 WL 6050264, *4 (D. Ariz. Nov. 8, 2019); *United States v. Bucci*, 2019 WL 5075964, *1 (D. Mass. Sept. 16, 2019); *United States v. Beck*, 2019 WL 2716505, at *7.

Courts still "universally turn to" the Commission's policy statement "to provide guidance" on the appropriate criteria. *United States v. McGraw*, 2019 WL 2059488 at *2; accord *York*, 2019 WL 3241166 at *4. And courts grant compassionate release only for reasons that are "comparable or analogous to what the Commission has already articulated as criteria for compassionate release." *Fox*, 2019 WL 3046086 at *3.

Again, the applicable policy statement limits compassionate release to situations involving age, illness, or extreme family circumstances, or instead to cases in which the Director of the Bureau of Prisons has specifically authorized release. USSG § 1B1.13, Commentary, Note 1(A)-(D). In this sense, these categories "form the heartland of

compassionate release cases." *United States v. Brown*, 2019 WL 4942051, *4 (S.D. Iowa Oct. 8, 2019).

And again, Aransiola does not claim that he meets any of those categories. He is not old, he is not sick or dying, he doesn't have a spouse who has died or become incapacitated, and the Director of the Bureau of Prisons has never authorized his early release. Instead, Aransiola argues he should be released because he is 50 years old and has Hepatitis B.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and, therefore, does not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F. 3d 594, 597 (3d Cir. 2020); *see also U.S. v. Eberhart*, 448 F. Supp 3d 1086, 1090 (N.D. Cal 2020), ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[5] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, it would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully-imposed sentences to deal with a world-wide viral pandemic.

---

[5] See also, e.g., United States v. Coles, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); United States v. Okpala, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); United States v. Weeks, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); United States v. Haney, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); United States v. Pinto-Thomaz, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); United States v. Korn, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere possibility of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); United States v. Carver, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under Section 3582(c)(1)(A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19.U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I).

In this case, Aransiola's Hepatitis B is being treated by "self-care" and there is not any evidence that self care has affected his ability to function in a correctional setting.

### Public Safety Risk

Moreover, Aransiola has not demonstrated that he is not a danger to the safety of the community or otherwise merits release under the § 3553(a) factors. Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2). Additionally, this Court must consider the Section 3553(a) factors, as "applicable," as part of its analysis. See 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

In this case, Aransiola was clearly a leader in a large-scale, international poly drug distribution organization and received a lengthy 360 month sentence which properly reflected his danger to the community. Aransiola's PSR recommended a four level increase because he was an organizer or leader in the offense. (PSR ¶¶ 55) The PSR also recommended a two- level increase because Aransiola used a minor while committing the offense ( PSR¶ 56). This Court has not been presented with any evidence that would indicate that Aransiola would not pose a danger to public safety if released and should deny a sentence reduction on that basis alone.

### Conclusion

For the reasons above reasons, this Court should deny Aransiola's motion for compassionate release.

Respectfully submitted,

JENNIFER B. LOWERY
Acting United States Attorney

*/s/ Stuart A. Burns*
STUART A. BURNS
713-567-9580

## Certificate of Service

I certify that on February 26, 2021, I electronically filed this document with the Clerk of Court using the CM/ECF system with a copy mailed to Olabode Timothy Aransiola at the following:

Olabode Timothy Aransiola
Reg # 21503-424
C.I. Giles W. Dalby
805 North Avenue F
Post, Texas 79356

*/s/ Stuart A. Burns*
STUART A. BURNS
Assistant United States Attorney